## TOWN OF SOUTH WINDSOR *v.* SOUTH WINDSOR POLICE UNION, LOCAL 1480, COUNCIL 15, AFSCME, AFL-CIO
### (14347)

Dupont, C. J., and O'Connell and Spear, Js.

Argued January 17—officially released June 11, 1996

*Harry B. Elliott, Jr.*, with whom, on the brief, was *Robert J. Murray, Jr.*, for the appellant (defendant).

*David L. Metzger*, for the appellee (plaintiff).

*Richard Blumenthal,* attorney general, and *Charles Overend* and *Laurie Adler*, assistant attorneys general, filed a brief for the state board of mediation and arbitration as amicus curiae.

*Mary-Michelle U. Hirschoff* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

*Jeffrey F. Gostyla* filed a brief for the Connecticut Police Chiefs Association as amicus curiae.

*Jon L. Schoenhorn* filed a brief for the Connecticut State Police Union et al. as amici curiae.

SPEAR, J. The defendant, the South Windsor Police Union, Local 1480, Council 15, AFSCME, AFL-CIO (union), appeals from the judgment of the trial court vacating an arbitration award that had ordered the reinstatement of one of its members (grievant) to the South Windsor police department. The union claims that the trial court improperly ruled that the award (1) was untimely, (2) violated public policy, and (3) violated a provision of the collective bargaining agreement (agreement) that precludes reinstatement where the grievant was exonerated on some, but not all, of the charges. We affirm the judgment of the trial court.

We glean the following facts from the arbitration award. The grievant, a nine year veteran of the South Windsor police department, was charged by the plaintiff, the town of South Windsor (town), with violating the following regulations of the police department duty manual: § 2.3.8, improper use of intoxicants; §§ 2.3.36 and 2.2.7, improper dissemination of police information, particularly with respect to an informant; § 2.2.6, misuse of his position; § 2.3.10, improper association with a felon; § 2.3.2, conduct unbecoming an officer; and § 2.3.3, neglect of duty. The charges arose primarily out of the grievant's conduct at town bars where there was known illicit drug activity.

A principal charge against the grievant was that on three separate occasions in July and August, 1990, he improperly disseminated information about a person known as R. On those occasions, the grievant told a woman, whom he believed to be a buyer of illicit drugs, that R. was an informant for the Tri-Town Narcotics Task Force (task force) and that she should not get

involved with him. Prior to the time that he made the statements, the grievant had dated a woman who claimed that she was R.'s fiancee. R. had told several people that he would have the grievant's job and the grievant made the statements hoping to "burn"[1] R.

Unbeknownst to the grievant, the woman to whom he gave the information was an undercover police officer for the task force. She frequented the bars seeking to befriend drug dealers, make buys and set up those dealers for arrest by the task force. The task force operations were successful because of the effectiveness of the undercover officer.

After conducting hearings on the charges, the town terminated the grievant's employment. Pursuant to the agreement, the union demanded arbitration before the state board of mediation and arbitration (board), and a panel of three arbitrators was selected to hear the matter. After hearing the case, the board found that the grievant had violated §§ 2.2.7 and 2.3.36 (divulging information regarding R.), 2.3.2 (conduct unbecoming an officer) and 2.3.10 (improper association with a felon).[2] As a remedy, the board ordered the grievant reinstated after serving a 150 day suspension, with back pay for the period of time that the grievant was out of work in excess of 150 days.[3]

The town sought to vacate the award in Superior Court, claiming that the award was not timely and that

---

[1] The parties agree that "burning" someone, in the context of the illicit drug culture, means to assert to a member or members of that culture that the person is a police informant. The defendant contends that such a "burn" is simply designed to ostracize the named person from the illicit drug community. The town contends that such "burns" have more sinister implications as they put the person who is labelled as an informant at serious risk of physical harm.

[2] The board exonerated the grievant of allegations that he had violated § 2.3.8, use of intoxicants, § 2.2.6, misuse of official position, and § 2.3.3, neglect of duty.

[3] One arbitrator dissented as to the back pay award.

it violated public policy as well as the reinstatement provisions of the agreement. The union filed an application to confirm the award. This appeal followed the trial court's judgment vacating the award.

I

The trial court found that the final briefs were received by the board on January 28, 1993, and that the award was issued on April 20, 1994, almost fifteen months later. The trial court ruled that "the award was not rendered within the time permitted by [General Statutes] § 52-416 (a)[4] and therefore shall 'have no legal effect.' "[5]

Arbitration was sought before the board pursuant to § 16.5 of the agreement.[6] General Statutes § 31-98[7] governs the procedures the board must follow when issuing a decision in an arbitration proceeding. Section 31-98 requires a majority of the members of the board to sign a written decision within fifteen days from the conclusion of the proceedings unless the parties other-

[4] General Statutes § 52-416 (a) provides in pertinent part: "If the time within which an award is rendered has not been fixed in the arbitration agreement, the arbitrator or arbitrators . . . shall render the award within thirty days from the date the hearing or hearings are completed . . . ."

[5] The trial court also stated that "the award was not rendered within a reasonable time." This language is surplusage as the court clearly ruled pursuant to § 52-416 (a).

[6] Section 16.5 of the collective bargaining agreement provides that step four of the grievance procedure is "[t]he right to submit within fifteen (15) working days the matter to the State of Connecticut Board of Mediation and Arbitration, said arbitration decision shall be final and binding on all parties."

[7] General Statutes § 31-98 provides in pertinent part: "The panel . . . may, in its discretion and with the consent of the parties, issue an oral decision immediately upon conclusion of the proceedings. If the decision is to be in writing, it shall be signed, within fifteen days, by a majority of the members of the panel . . . and the decision shall state such details as will clearly show the nature of the decision and the points disposed of by the panel. Where the decision is in writing, one copy thereof shall be filed by the panel in the office of the town clerk in the town where the controversy arose and one copy shall be given to each of the parties to the controversy. . . ."

wise consent to the issuance of an oral decision. In determining whether an earlier version of § 31-98 or an earlier version of § 52-416 (a) applied to a matter heard by the board, our Supreme Court stated: "In considering the intended operation of a statute, courts must presume that the legislature in enacting it had existing relevant legislation in mind. . . . In view of this cardinal principle of statutory construction, the General Assembly, by specifically dealing in [§ 31-98] with the time limitation, demonstrated an intent that the limitation of [thirty] days provided for in [§ 52-416 (a)] should not apply to an award by the board of mediation and arbitration. A reasonable construction of the intent expressed is that the board should be governed by the specific legislation enacted for its guidance and not by general legislation pertaining to arbitration." (Citation omitted.) *Danbury Rubber Co.* v. *Local 402*, 145 Conn. 53, 58, 138 A.2d 783 (1958).

The question of whether the fifteen day time period in § 31-98 is mandatory was answered in *AFSCME* v. *New Britain*, 206 Conn. 465, 468, 538 A.2d 1022 (1988), in which our Supreme Court stated that "[w]e have previously concluded that the time limitation in this statute's predecessor was directory and not mandatory. . . . We have also held that [i]n the absence of a mandatory time limitation [in either the collective bargaining agreement or the submission to the arbitrators], an award of arbitrators may be made within a reasonable time." (Citation omitted; internal quotation marks omitted.)

The town claims that even if § 31-98 governs, the thirteen month delay between the close of the proceedings and the decision was unreasonable. We do not need to address this claim "because the plaintiff's failure to raise the issue of timeliness *prior* to the issuance of the arbitration award operates as a waiver of [its] right to assert the lack of timeliness in the board's decision.

The record discloses that the only challenge to timeliness is contained in the post-decision application to vacate the award." (Emphasis added.) *AFSCME* v. *New Britain,* supra, 206 Conn. 468. As in *AFSCME* v. *New Britain,* supra, 468, the plaintiff here waived any issue of timeliness by waiting to object until after the award was issued. The trial court, therefore, improperly ruled that the award was untimely.

## II

The town next argues that the arbitration award would violate public policy by reinstating a police officer who deliberately revealed the identity of a confidential informant, with the attendant risk to that informant's safety and jeopardy to police operations. The town asserts that public policy demands that the identity of confidential informants be protected. We agree.

It is a well accepted proposition that the courts favor arbitration. See *Hartford* v. *Board of Mediation & Arbitration,* 211 Conn. 7, 14, 557 A.2d 1236 (1989). An award, however, can be vacated where its enforcement would violate "some explicit public policy that is well defined and dominant, and is . . . ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Internal quotation marks omitted.) *Watertown Police Union Local 541* v. *Watertown,* 210 Conn. 333, 340, 555 A.2d 406 (1989). A vacatur on public policy grounds is premised on the notion that the parties cannot expect an award "approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." Id., 339–40.

Our statutes and case law are sources of public policy and those sources clearly establish that the identity of confidential informants should be protected. General

Statutes § 1-19 (b) of the Freedom of Information Act expresses this strong public policy by providing in pertinent part: "Nothing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be construed to require disclosure of . . . (3) records of law enforcement agencies not otherwise available to the public which records were compiled in connection with the detection or investigation of crime, if the disclosure of said records would not be in the public interest *because* it would result in the disclosure of (A) the identity of informants not otherwise known . . . ." (Emphasis added.)

In *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 658–59, 631 A.2d 252 (1993), our Supreme Court held that the Freedom of Information Act does not require the disclosure of information regarding an arrest beyond what appears in the arrest report, namely, the "name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested." The *Gifford* court noted the comments that were made in support of an amendment to the Freedom of Information Act that limited what could be disclosed to the public about an arrest. Those comments graphically depict the policy reasons for prohibiting the disclosure of an informant's identity. "In favorably commenting on the amendment, Representative Francis X. O'Neill, Jr., stated: 'Many years ago . . . in my years in . . . law enforcement, a record of an arrest included the affidavit to support an arrest, the arrest warrant itself and the blotter record entry. If the bill, as written, went through, it would completely destroy every single undercover activity that any police department in this state attempted to go into. It would destroy all informants; quite frankly, it could be called a murder bill. It would kill informants. I personally have taken informants off meat racks who are dead. I personally have taken informants out of automobiles

who were dead. They were police officers. They were individuals whose names had been disclosed either intentionally or unintentionally. A police officer puts his life on the line; this particular amendment would save their lives.' 26 H.R. Proc., Pt. 8, 1983 Sess., pp. 2772–73." *Gifford* v. *Freedom of Information Commission*, supra, 660. Our public policy clearly prohibits improper disclosure of a confidential informant's identity.

The union advances five arguments in support of its claim that the award does not violate public policy: (1) the grievant did not reveal information within the scope of General Statutes §§ 54-142a or 54-142g, the statutes relied on by the trial court; (2) R. was not found to be an informant; (3) the South Windsor police department repeatedly "burns"[8] drug suspects; (4) the grievant's actual knowledge regarding R.'s status as an informer was no greater than that of persons in the illicit drug culture because participants in that culture inferred that a person was an informant when that person appeared back on the streets shortly after an arrest; and (5) the grievant's conduct was not prohibited by law. We will examine each of these assertions in turn.

While it is true that the trial court cited only § 54-142a et seq. and § 54-142g et seq. in its memorandum of decision, the court relied on *Watertown Police Union Local 541* v. *Watertown*, supra, 210 Conn. 340, which states that public policy "is to be ascertained by reference to the laws and legal precedents . . . ." The statutes cited by the court illustrate only one aspect of the public policy restricting the dissemination of certain criminal record information. Moreover, we may affirm a correct result of the trial court for reasons different from those stated by the trial court. *Ivey, Barnum & O'Mara, Inc.* v. *Indian Harbor Properties*, 190 Conn.

---

[8] See footnote 1.

528, 532, 461 A.2d 1369 (1983); *CMG Realty of Connecticut, Inc.* v. *Colonnade One Ltd. Partnership*, 36 Conn. App. 653, 660, 653 A.2d 207 (1995). The decision of our Supreme Court in *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 641, and the Freedom of Information Act provision discussed previously express the public policy of the state against disclosing the identity of confidential informants.

The union correctly states that the board did not find that R. was an informant for the task force. The board, however, stated that after R. was arrested as part of the task force sweep, "only then did he cease to be used as an informant." The board was obviously persuaded that R. had been used as an informant by the South Windsor police department at some point although he was not part of the task force operation. Moreover, as the plaintiff argues persuasively, whether R. was, in fact, an informant does not excuse the violation of public policy. The board found that as a known police officer, the grievant's assertion that R. was an informant gave the statement authenticity. Such apparent authenticity could, in turn, discourage other informants or potential informants from cooperating with the police for fear of disclosure and the attendant risk of physical harm or death. "Clearly the state has a strong public interest in protecting the identity of confidential informants in order to encourage the flow of information necessary in criminal prosecutions." *State* v. *Telesca*, 199 Conn. 591, 606, 508 A.2d 1367 (1986); see also *State* v. *McDaniel*, 176 Conn. 131, 133, 405 A.2d 68 (1978); *State* v. *Leonard*, 31 Conn. App. 178, 198, 623 A.2d 1052 (1993).

The board did note that "[t]he evidence shows that police 'burn' suspects during investigations for various specific purposes. The grievant's purpose was improper and not authorized by anyone." The board also stated in its award that "although the union attempted to convince the panel that it was an acceptable police tech-

nique to 'burn' drug dealers who could not be arrested, it did not persuade the panel that the grievant should not be disciplined for this unauthorized activity." The short answer to this claim is that police conduct does not define public policy. As the union correctly asserts, public policy is established by our constitutions, statutes and legal precedents. Police practices and procedures may reflect public policy but those practices and procedures do not determine that policy. We note, for example, that § 2.3.36 (c) of the police manual prohibits the dissemination of information regarding confidential informants, a provision that incorporates the state's public policy against such disclosure. If the board was in fact convinced that the South Windsor police department engaged in "burning" suspects, such a finding is nevertheless irrelevant on the issue of whether the award violates public policy.

The union's fourth argument also has no bearing on the public policy issue. It claims that the grievant's knowledge as to whether R. was an informant was no greater than that of those in the illicit drug culture who would infer that R. was an informant because of his quick release after arrest. The board's finding that the grievant's status as a known police officer made the disclosure authentic and effective also disposes of this argument. The potential harm to police operations resulted regardless of whether others suspected that R. was an informant. Furthermore, the risk of harm to R. could have been heightened only by this "official" affirmation that he was an informant.

The union last argues that the grievant's conduct was not prohibited by any law. General Statutes § 7-276 provides in pertinent part that "[s]uch [board of police commissioners] shall have the sole power of appointment, promotion and removal of the officers . . . of such police department, under such regulations as it adopts for the purpose, and such appointees shall

hold office during good behavior and until removed for cause upon written charges and after hearing." Good behavior is a requirement for police officers. The grievant's conduct clearly violated the statutory good behavior requirement and thus violated the public policy of our state. The trial court's vacatur of the award was proper.[9]

The judgment is affirmed.

In this opinion the other judges concurred.

[9] Our resolution of the timeliness and public policy issues obviates the need to discuss whether the award violates the remedy provisions of the agreement.